UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

STANFORD HOSPITAL AND CLINICS, a California nonprofit corporation,

Plaintiff,

v.

HUMANA, INC.,

Defendant.

Case No.  5:13-cv-04924 HRL

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

[Re:  Dkt. 40]

In this diversity action, Stanford Hospital and Clinics (Stanford) sues Humana, Inc. (Humana) for $171,983.00 that Stanford says it should have been paid for medical services it provided to a Patient[1] enrolled in a Humana health care plan.  Humana denied the claim pursuant to a pre-existing condition limitation in Patient's health insurance policy.  Humana now moves for summary judgment on Stanford's claims for breach of contract and for violation of California Health & Safety Code § 1371.8.[2]  Stanford opposes the motion.  All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by the

---

[1] The enrollee in question will be referred to only as "Patient" here.

[2] Defendant also moved for summary judgment on Stanford's third claim for quantum meruit. That portion of defendant's motion is unopposed, and the parties have since stipulated to the dismissal of that claim.  Accordingly, defendant's summary judgment motion is denied as moot as to the quantum meruit claim only.

undersigned. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. Upon consideration of the moving and responding papers,[3] as well as the arguments of counsel, this court grants the motion.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed:

On March 11, 2013, Patient had surgery at Stanford to remove an acoustic neuroma (essentially, a brain tumor). Several months before her surgery, Patient, who is an Arizona resident, applied for and was enrolled in one of Humana's health plans, effective November 1, 2012. Humana says that it does not itself sell or issue health insurance policies. Rather, it uses wholly-owned subsidiaries in different states, such as Humana Insurance Company (HIC), to sell and issue health and other insurance policies. (Lenahan Decl. ¶ 3). HIC issued Patient's health insurance policy under the group name HumanaOne of Arizona. (Mueller Decl. ¶ 5). The policy includes a pre-existing condition limitation that provides, in relevant part:

> We will not pay benefits for services rendered for pre-existing conditions or complications of a pre-existing condition for a period of 12 months from the effective date of the covered person unless those conditions were fully disclosed on the enrollment form for this Certificate and benefits relating to those conditions are not specifically excluded.

(Id., ¶ 10, Ex. B, Section 5.b). The policy defines "pre-existing condition" as "any disease, illness, sickness, malady or condition which was diagnosed or treated by a provider or exhibited signs or symptoms during the specified time period prior to the covered person's effective date." (Id., Ex. B, Section 12). The "specified time period" is "the five year period immediately prior to the covered person's effective date." (Id., Ex. B, Section 5.a.2.a.).

When she filled out the health insurance enrollment form, Patient did not disclose that she had been experiencing symptoms, such as vertigo, tinnitus, dizziness, and right-sided hearing loss, for about two years. (Mueller Decl. ¶¶ 9, 12, Exs. A and D). As noted above, in early 2013 she sought treatment for these symptoms at Stanford, where her tumor was diagnosed in February and

---

[3] Defendant's request for judicial notice is granted. Fed. R. Evid. 201. Defendant's evidentiary objections are discussed as necessary in the body of this order. The remainder of defendant's objections are addressed in this order's addendum.

1   surgically removed the following month.

2        Stanford periodically enters into written contracts with health insurance companies and
3   health plans for the provision of medical services. In 2001, it entered into the ChoiceCare
4   Agreement,[4] which is the contract between Stanford and Humana that governs their dispute in this
5   case. The essential portions of the agreement's relevant provisions are as follows:

> Section 2.1    Subject at all times to the terms of this Agreement, HOSPITAL agrees to provide services to individuals (hereinafter "Members") covered under designated self-insured employer plans, employer trusts, insurance policies, government sponsored programs or other third party payors' health benefits contracts (hereinafter referred to as "Plan" or "Plans"). . . .
>
> Section 4.2    HOSPITAL acknowledges and agrees that all rights and responsibilities arising with respect to benefits to Members shall be subject to the terms of the Payor Plan covering the Member. …
>
> Section 7.1    HOSPITAL agrees to provide Hospital Services to Members in accordance with this Agreement and the applicable Plan (hereinafter "Covered Services"). ...
>
> Section 14.1   HOSPITAL shall be paid for Covered Services provided to Members. . . ..

(Gonzalez Decl. ¶ 7, Ex. A).

     Stanford says that in non-emergencies (as was the case with Patient), its standard practice is to contact the relevant health insurance company to verify benefits and eligibility and to obtain authorization before rendering services. (Honeyman Decl. ¶ 7). If authorization is not obtained, Stanford says that it makes alternative arrangements and maintains the right to decline to treat a patient absent a source of payment. (Id.). On March 4, 2013, about a week before Patient's surgery, Stanford says it called Humana. It is undisputed that Humana verified Patient's benefits and authorized the services. However, the parties disagree whether Humana's authorization was given with a disclaimer.

     According to Humana, the verification and authorization process merely signifies that a

---

[4] Humana says that ChoiceCare is a provider network it operates and leases to self-insured employers and other health plans that want to use a network in a particular geographic area. (Majam-Simpson Decl., Ex. J (Gonzalez Depo. at 10:22-11:5)). HumanaOne of Arizona uses the ChoiceCare Contract to allow its members to access California hospitals. (Id. (Gonzalez Depo. at 11:10-15); Gonzalez Decl. ¶ 7).

policy exists and that treatment is medically necessary. Defendant says that when it verifies benefits or authorizes services, its standard practice is to tell healthcare providers that the services are subject to all insurance policy provisions and limitations---i.e., that Humana's verifications and authorizations are not guarantees of payment. (Majam-Simpson Decl., Ex. B, Deft's Responses to Special Interrogatories, Set One, No. 2; Ex. E, Thomas Depo., 20:2-21:16; Mueller Decl. ¶ 3). Humana says it gives this disclaimer, using the following script when giving authorizations to medical providers:

> Authorization is based on medical necessity and does not guarantee payment. Benefit levels and member eligibility are not determined as part of this authorization process. This service is subject to all policy provisions, limitations, and exclusions. As part of the benefit determination process, it may be necessary to obtain additional information to determine if these services are related to an undisclosed condition for which treatment was received or signs or symptoms were present prior to the effective date of this coverage. If it is determined that this service is not covered under the terms of the policy, the member will be financially responsible for these services. . ..

(Mueller Decl. ¶¶ 3, 16, Ex. H, p. 4). Defendant contends that this disclaimer would have been given to Stanford in any phone call verifying coverage or authorizing services. While Humana says it was unable to locate records of all of Stanford's alleged phone calls, it has the recording of one call from A. Holmes (calling on Stanford's behalf) to D. Smith (Humana's service representative) relating to Patient. Humana's transcript of the recording does not show the date the call was made, but Holmes says that she is calling "to verify eligibility and benefits and determine if there's an authorization on file." (Mueller Decl., ¶ 11, Ex. C at p. 1). There is no indication that the disclaimer, as scripted above, was given to Holmes. But, at one point during the call, Smith tells Holmes, "And remember, it's important to understand that all benefits and payments are subject to the member's eligibility at the time services are rendered and claims received or benefit changes made within the past 30 days may not be reflected in this information." (Id. at p. 3).

Stanford, on the other hand, contends that Humana authorized Patient's services and at no time specifically said that benefits would be denied based on the pre-existing condition limitation

4

in her policy. Plaintiff says that, according to its records for Patient, on March 4, 2013, Holmes spoke with one "Carla A." at Humana, who verified the benefits under Patient's policy. (Honeyman Decl. ¶ 4, Ex. 2).[5] Those same records, says Stanford, also show that on March 8, 2013, Humana authorized a 3-day stay at the hospital. (Id.). Stanford claims that it proceeded with Patient's surgery on March 11 based on the March 4 verification and the March 8 authorization, believing that it would be paid for its services. (Id. ¶¶ 6, 8).[6]

It was also around March 2013 that Humana says it began receiving numerous claims for Patient's medical treatments, including for the services she received at Stanford. Humana says that, given the close proximity in time between the effective date of Patient's policy and the filing of these claims, it decided to investigate whether she had a pre-existing condition that should have been disclosed on her insurance enrollment form. In early April 2013, several weeks after Patient's surgery, Humana asked Stanford for her medical records. After reviewing them, Humana determined that Patient had a pre-existing condition and denied the claims for payment pursuant to the pre-existing condition limitation in her policy.

This lawsuit followed. Stanford claims that Humana's denial of benefits, made only after the services were authorized and rendered, is not only a breach of the ChoiceCare Agreement, but also is a violation of California's Knox-Keene Act, Cal. Health & Safety Code § 1371.8. Humana maintains that under the agreement's express terms, it has no obligation to pay Stanford for services that are not covered by Patient's policy. Additionally, Humana says that the Knox-Keene Act does not apply to Patient's Arizona health plan and that there is no private right of action under § 1371.8. For the reasons discussed below, defendant's motion for summary judgment is granted.

## LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);

---

[5] Defendant's objections to this portion of Honeyman's testimony are overruled. Fed. R. Evid. 803(6).

[6] Defendant's objections to the first sentence of Honeyman Decl. ¶ 8 are overruled.

5

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. See Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. See id. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248-49.

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at 325). Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial. Id.

## DISCUSSION

### I. CLAIM 1: BREACH OF CONTRACT

Under California law, a claim for breach of contract consists of the following elements: (1) the existence of a contract; (2) plaintiff's performance (or excuse for nonperformance); (3) defendant's breach; and (4) damages. First Commercial Mortgage Co. v. Reece, 89 Cal.App.4th 731, 745, 108 Cal.Rptr.2d 23 (2001). In this case, the first two elements are not at issue. As presented to this court, the question whether Humana breached the ChoiceCare

6

Agreement by denying payment turns on the parties' differing interpretations of that contract.

Contract interpretation is a question of law for the court to decide, unless the interpretation depends on the credibility of extrinsic evidence---in which case, the issue must be left to the trier of fact.  Welles v. Turner Entertainment Co., 503 F.3d 728, 735 (9th Cir. 2007).  The court first looks to the contract itself to determine if its language is ambiguous or reasonably susceptible to more than one interpretation.  Id.  If the language is unambiguous, the court gives effect to its plain meaning.  Id.  If the language is ambiguous, or susceptible to more than one reasonable interpretation, the court may consider extrinsic evidence in interpreting the agreement.  Id.

"Even if the written agreement is clear and unambiguous on its face, the trial judge must receive relevant extrinsic evidence that can prove a meaning to which the language of the contract is 'reasonably susceptible.'"  Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866, 871 (9th Cir. 1979).  But if, after considering this evidence, the court finds that the contract language is not reasonably susceptible to the interpretation urged and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract.  Id.

Humana argues that it is entitled to summary judgment because the ChoiceCare Agreement terms are unambiguous and mean that Stanford is entitled to payment, but only for services that are covered by Patient's health care policy.  Stanford contends that the plain language of Sections 7.1 and 14.1 of the ChoiceCare Agreement require Humana to pay for services that are rendered, and that Humana's determination whether the services are covered under Patient's health care policy is a separate matter.  As discussed above, Section 7.1 essentially says that Stanford "agrees to provide Hospital Services to Members in accordance with this Agreement and the applicable Plan (hereinafter 'Covered Services')."  (Gonzalez Decl. ¶ 7, Ex. A).  Stanford argues that because it provided services to Patient and because there is no dispute as to the manner in which those services were provided, Section 14.1 of the agreement requires that Stanford "shall be paid for Covered Services provided to Members."  (Id.).

The problem for Stanford is that those provisions of the ChoiceCare Agreement cannot be read in isolation.  Section 2.1 of the agreement says that "[s]ubject at all times to the terms of this Agreement," Stanford "agrees to provide services to individuals (hereinafter 'Members') covered

7

1  under designated self-insured employer plans, employer trusts, insurance policies, government
2  sponsored programs or other third party payors' health benefits contracts (hereinafter referred to as
3  "Plan" or "Plans"). (Id.). And, Section 4.2 says that Stanford "acknowledges and agrees that *all*
4  *rights and responsibilities arising with respect to benefits to Members shall be subject to the terms*
5  *of the Payor Plan covering the Member*." (Id.) (emphasis added). There is no dispute that the
6  pertinent "Payor Plan" is Patient's health insurance policy and that her policy contains a pre-
7  existing condition limitation.

Arguing that Humana's interpretation of the agreement is contrary to the parties' intent, plaintiff offers the deposition testimony and the declaration of Jan Gazenbeek, Stanford's Director of Managed Care.[7] The court has given preliminary consideration to this testimony; but, for the reasons to be discussed, the court concludes that the language of the ChoiceCare Agreement is not reasonably susceptible to the interpretation plaintiff asserts and that Gazenbeek's testimony cannot be received to vary the terms of the contract. As Stanford's Director of Managed Care, Gazenbeek says he directs and manages Stanford's contract negotiations with commercial insurance carriers and health plans. (Gazenbeek Decl. ¶ 2). He has held this position at Stanford since 2003, i.e., after the ChoiceCare Agreement was executed in 2001. Gazenbeek nevertheless states that he is familiar with the ChoiceCare Agreement and its terms. To the extent Gazenbeek's testimony is offered to explain Stanford's purpose in contracting generally, the court finds that he is competent to do so. It therefore will consider that testimony and overrule defendant's objection to ¶ 2 (p. 2:15-18) of the Gazenbeek declaration for that purpose---albeit, as discussed below, the court ultimately concludes that this testimony is irrelevant. However, the court sustains defendant's objections to the following portions of the declaration: the statements in ¶ 5 (p. 3:1-6) as irrelevant, speculative, and impermissible legal conclusions, Fed. R. Evid. 401, 602; and the statements in ¶ 9 (p. 3:20-25) as speculative and impermissible legal conclusions. Fed. R. Evid. 602. The upshot of Gazenbeek's testimony, then, is this:

---

[7] The gist of Gazenbeek's deposition testimony and his declaration submitted in support of plaintiff's opposition papers is the same. (See Hapak Decl. ¶ 12, Ex. 13 (Gazenbeek Depo)). The court has read and considered all of his testimony, but for simplicity, focuses here on the assertions in Gazenbeek's declaration.

- "So long as Stanford has *provided hospital services* in accordance with the Agreement and the member Plan, Stanford is entitled to payment. A benefit term determination made by Humana after the fact is separate and distinct from the manner in which Stanford provided services." (Gazenbeek Decl. ¶ 9). Gazenbeek appears to acknowledge that Stanford's provision of services is subject to the ChoiceCare contract and the terms Patient's policy. To the extent Gazenbeek is saying that the ChoiceCare Agreement means that Stanford is to be paid, without regard to conditions and limitations in Patient's health care policy, the contract's terms are not reasonably susceptible of that interpretation. As discussed, that interpretation fails to take account of the contract as a whole, focusing solely on Sections 7.1 and 14.1, without considering Sections 2.1 and 4.2.

- Gazenbeek otherwise states: "Stanford contracts with payors to assure that payment will be rendered for medically necessary services provided to a payor's beneficiaries. If Stanford has no means to determine whether payment for a particular service will be made by a payor *before* rendering services, Stanford's purpose for contracting would be defeated." (Gazenbeek Decl. ¶ 2). Stanford argues that the agreement must be construed to mean that Section 4.2 does not apply after Humana authorizes services. But plaintiff points to nothing in the contract that says so. "In construing a contract, the court's function is to ascertain and declare what, in terms and substance, is contained in that contract, and not to insert what has been omitted." Levi Strauss & Co. v. Aetna Casualty & Surety Co., 184 Cal. App.3d 1479, 1486, 237 Cal. Rptr. 473, 477 (1986). Here, the express contract terms state, without limitation, that "all rights and responsibilities arising with respect to benefits to Members shall be subject to the terms of the Payor Plan covering the Member." (Gonzalez Decl. ¶ 7, Ex. A). Additionally, there is no indication that Gazenbeek was involved in the negotiation of the ChoiceCare Agreement. Thus, his testimony is simply evidence of Stanford's interpretation and understanding of the terms of the contract well after the agreement was executed.

9

> Even if his testimony was probative of Stanford's subjective intent, there is no indication that Stanford communicated or expressed this intent at the time of contracting. See SCC Alameda Point LLC v. City of Alameda, 897 F. Supp.2d 886, 897 (N.D. Cal. 2012) ("Undisclosed communications and understandings are not credible extrinsic evidence and may not be used by the Court to determine the parties' mutual intent.").

As discussed, Stanford claims that Humana never specifically said that benefits would be denied based on the pre-existing condition limitation in her policy. However, plaintiff does not refute Humana's evidence that prior to the provision of services, Humana told Stanford "that all benefits and payments are subject to the member's eligibility at the time services are rendered and claims received or benefit changes made within the past 30 days may not be reflected in this information." (Mueller Decl., ¶ 11, Ex. C at p. 3). Stanford does not, and cannot, argue that Humana waived the pre-existing condition limitation in Patient's policy because waiver of a material condition of a contract is not binding unless additional consideration is given for that waiver. See Stanford Hosp. & Clinics v. Multinational Underwriters, Inc., No. C07-05497 JF (RS), 2008 WL 5221071 at *7 (N.D. Cal., Dec. 12, 2008) (citing Regents of Univ. of Cal. v. Principal Financial Group, 412 F. Supp.2d 1037, 1042 (N.D. Cal. 2006)).

For the first time in its opposition papers, Stanford asserts that Humana breached the covenant of good faith and fair dealing. Pointing out that plaintiff did not assert any such claim in its complaint, Humana argues that Stanford cannot raise it for the first time on summary judgment. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). At oral argument, plaintiff stated that it is not required to plead a separate claim for relief. That is true, insofar as the implied covenant claim is based on the same breach as the contract claim. See generally Guz v. Bechtel Nat., Inc., 24 Cal.4th 317, 352, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000) ("a claim that merely realleges [a contractual] breach as a violation of the covenant is superfluous."); Careau & Co. v. Sec. Pac. Bus.

10

Credit, Inc., 222 Cal.App.3d 1371, 1395, 272 Cal.Rptr. 387 (1990) ("If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated."). As discussed below, however, Stanford appears to base its implied covenant claim on a different purported breach that appears nowhere in its complaint. And, plaintiff's arguments re an alleged breach of the implied covenant are unpersuasive in any event.

A claim for breach of the covenant of good faith and fair dealing requires a plaintiff to show the following: "(1) the plaintiff and the defendant entered into a contract; (2) the plaintiff did all or substantially all of the things that the contract required him to do or that he was excused from having to do; (3) all conditions required for the defendant's performance had occurred; (4) the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract; and (5) the defendant's conduct harmed the plaintiff." Woods v. Google, Inc., 889 F. Supp.2d 1182, 1194 (N.D. Cal. 2012). "The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." Guz, 24 Cal.4th at 349, 100 Cal. Rptr.2d 352 (citations omitted). It "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." Id. at 349-50.

Stanford argues that Humana breached the implied covenant by engaging in post-claims underwriting,[8] which plaintiff says is prohibited by the Knox-Keene Act, Cal. Health and Safety Code § 1389.3. Essentially, plaintiff says that it was denied its bargained-for benefit under the ChoiceCare Agreement (i.e., payment) because Humana failed to conduct a sufficient investigation into Patient's medical history until after services were rendered. To the extent

---

[8] "In essence, postclaims underwriting occurs when an insurer waits until a claim has been filed to obtain information and make underwriting decisions which should have been made when the application [for insurance] was made, not after the policy was issued." Hailey v. Cal. Physicians' Service, 158 Cal. App.4th 452, 465, 69 Cal. Rptr.3d 789, 799 (2007).

11

plaintiff seems to be arguing a different alleged breach (post-claims underwriting or failure to conduct a sufficient investigation) than that underlying its contract claim (failure to pay), a claim for breach of the implied covenant would be distinct from its contract claim and should have been separately pled in its complaint. See generally Landucci v. State Farm Ins. Co., 65 F. Supp.3d 694, 716 (N.D. Cal. 2014) (stating that "a claim for breach of the implied covenant of good faith and fair dealing is not superfluous with a breach of contract claim when the covenant claim is based on a different breach than the contract claim.") (internal quotation marks and citation omitted). Moreover, although Stanford asserted a claim under the Knox-Keene Act (to be discussed shortly), that claim is based on a different section of the statute.

In any event, plaintiff fails to raise a triable issue as to an alleged breach of the implied covenant. Stanford cites to the declaration of Michael Honeyman, its Assistant Director of Patient Financial Services, who says that once eligibility and benefits have been verified, and authorization for services is given, Stanford expects that payment will be made. (Honeyman Decl. ¶ 8).[9] Honeyman's declaration, however, does not refute Humana's evidence as to its verification and authorization practices or that Humana told Stanford that all benefits and payments were subject to Patient's eligibility at the time the services were rendered. (Mueller Decl., ¶ 11, Ex. C at p. 3). Moreover, it is the terms of the agreement that control. See Guz, 8 P.3d at 1095 ("where an implied covenant claim alleges a breach of obligations beyond the agreement's actual terms, it is invalid."). There is nothing in the parties' contract that imposes on Humana an obligation to conduct any investigation in Stanford's favor pertaining to verifications and authorizations. Plaintiff points out that the California Supreme Court has observed that "[t]he covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." Carma Developers (California), Inc. v. Marathon Development California, Inc., 2 Cal.4th 342, 372 (1992). But, Carma Developers also went on to state that "as a general matter, implied terms should never be read to vary express terms." Id. at 374. As discussed above, the unambiguous

---

[9] Defendant's objections to this portion of Honeyman's declaration are overruled.

12

terms of the subject agreement mean that Stanford is to be paid, but only for services covered by Patient's policy. Plaintiff's other cited cases are inapposite in that they address an insurer's or health plan's duties to insureds and subscribers. See Nazaretyan v. Cal. Physicians' Service, 182 Cal. App.4th 1601, 107 Cal. Rptr.3d 137 (2010); Hailey v. Cal. Physicians' Service, 158 Cal. App.4th 452, 69 Cal. Rptr.3d 789 (2007); Communale v. Traders & Gen'l Ins. Co., 50 Cal.2d 654, 328 P.2s 198 (1968). The instant action concerns the business dealings between two sophisticated contracting entities.

The essential question is whether conditions giving rise to defendant's obligation to pay were met. Stanford cannot reasonably dispute that Patient's condition was not covered. Stanford argues that Patient's health care policy is inherently inconsistent with respect to the definition of "pre-existing condition," but fails to explain how or why that is so. And, having reviewed those portions of Patient's policy, the court finds no inconsistency. The definition of "pre-existing condition" appears in Section 12 of the policy; the provisions concerning "pre-existing condition" in Section 5 simply appear to discuss the matter in more detail. (Mueller Decl., ¶ 10, Ex. B).

Stanford nevertheless maintains that Humana's definition of "pre-existing condition" is overbroad and contrary to provisions of the Knox Keene Act which, it says, limit pre-existing condition provisions "to conditions for which medical advice, diagnosis, care, or treatment, including use of prescription drugs, was recommended or received from a licensed health practitioner during the 12 months immediately preceding the effective date of coverage." Cal. Health & Safety Code § 1357.51(2)(b). Here, Stanford says, Patient did not receive medical care for the tumor within 12 months of obtaining coverage. However, May 2012 medical records from Patient's primary care physician state that Patient was experiencing chronic vertigo and that she was referred to another physician for vertigo and decreased hearing acuity. (Mueller Decl. ¶ 12, Ex. D at HUMANA000223-225). Stanford argues that these were simply non-specific symptoms that could have been indicative of any number of things. But, defendant's unrefuted evidence, including Patient's own medical records, indicate that her vertigo and hearing issues were symptoms of the tumor. (Id. ¶ 8, 12 and Ex. D).

In sum, this court finds that the language of the ChoiceCare Agreement is unambiguous

13

1   and means that Stanford is entitled to payment, but only for services covered by Patient's policy.

2   Stanford has not presented cogent evidence supporting the alternate interpretation it urges. Nor

3   has it raised a triable fact issue precluding summary judgment. Accordingly, defendant's motion

4   is granted as to this claim.

**II. CLAIM 2: CAL. HEALTH & SAFETY CODE § 1371.8**

Stanford claims that Humana's refusal to pay for the services rendered to Patient violates California's Knox-Keene Act (Act), Cal. Health & Safety Code § 1371.8, which essentially prohibits a health care service plan from rescinding or modifying an authorization for services after the provider renders the service in good faith pursuant to the authorization. Under the Act, such rescission or modification of authorization is not allowed for "any reason," including the plan's subsequent determination that it did not accurately assess the enrollee's eligibility.[10] Humana contends that it is entitled to judgment on this claim because there is no private right of action under the Act. And, even if there were, defendant maintains that the Act's provisions do not apply to Patient, who is an Arizona resident with an Arizona policy. Because this court agrees that the Act does not provide plaintiff with a private right of action, defendant's motion for summary judgment as to this claim is granted, and the court does not reach Humana's remaining arguments.

"A violation of a state statute does not necessarily give rise to a private cause of action." Lu v. Hawaiian Gardens Casino, Inc., 50 Cal.4th 592, 596, 113 Cal. Rptr.3d 498, 236 P.3d 346 (2010). "Instead, whether a party has a right to sue depends on whether the Legislature has manifested an intent to create such a private cause of action under the statute. Id. (quotations and

---

[10] Cal. Health & Safety Code § 1371.8 provides, in relevant part:

> A health care service plan that authorizes a specific type of treatment by a provider shall not rescind or modify this authorization after the provider renders the health care service in good faith and pursuant to the authorization for any reason, including, but not limited to, the plan's subsequent rescission, cancellation, or modification of the enrollee's or subscriber's contract or the plan's subsequent determination that it did not make an accurate determination of the enrollee's or subscriber's eligibility.

citations omitted). "Such legislative intent, if any, is revealed through the language of the statute and its legislative history." Id. "A statute may contain clear, understandable, unmistakable terms, which strongly and directly indicate that the Legislature intended to create a private cause of action. For instance, the statute may expressly state that a person has or is liable for a cause of action for a particular violation." Id. at 597 (citations omitted). "If, however, a statute does not contain such obvious language, resort to its legislative history is next in order." Id.

Applying the general principles set out in Lu, a court in this district concluded that there is no private right of action under § 1371.4 of the Act. California Pacific Regional Med. Ctr. v. Global Excel Mgmt., Inc., No. 13-cv-00540NC, 2013 WL 2436602 (N.D. Cal., June 4, 2013). Neither side has cited authority addressing whether there is a private right of action under § 1371.8 of the Act. But, this court finds California Pacific's reasoning equally applicable here.

"The Knox–Keene Act is a comprehensive system of licensing and regulation under the jurisdiction of the Department of Managed Health Care." Bell v. Blue Cross of California, 131 Cal. App.4th 211, 215, 31 Cal. Rptr.3d 688, 691 (2005). While private individuals may bring suit under other statutes or common law to enjoin conduct made unlawful by the Act, "the California Court of Appeal has observed that private parties do not have a general power to enforce the Knox-Keene Act." California Pacific, 2013 WL 2436602 at *5; see also Blue Cross of California, Inc. v. Super. Ct., 180 Cal. App.4th 1237, 1250, 102 Cal. Rptr.3d 615 (2009) (stating that "although the Knox-Keene Act expressly authorizes the [Department of Managed Health Care] to enforce the statute and does not include a parallel authorization for suits by private individuals, private individuals can bring suit under the UCL for violations of the Knox–Keene Act."); California Med. Ass'n, Inc. v. Aetna U.S. Healthcare of California, Inc., 94 Cal. App.4th 151, 161, 114 Cal. Rptr.2d 109 (2001) (observing that "any standing [plaintiff] has to seek enforcement of section 1371 appears to be limited. [Plaintiff] does not have a general power to enforce Knox-Keene. Instead, such power has been entrusted exclusively to the [Department of Corporations] and now to the [Department of Managed Health Care], preempting even the common law powers of the Attorney General.").

Stanford has cited no authority to the contrary. Indeed, the cases it cites are inapposite in

that they do not address whether the plaintiffs had a stand-alone private right of action under the Act, but rather, whether the Act barred them from seeking relief under other statutes---namely, California's Unfair Competition Law.  (It does not).  See Bell v. Blue Cross of California, 131 Cal. App.4th 211, 31 Cal. Rptr.3d 688 (2005); Coast Plaza Doctors Hosp. v. UHP Healthcare, 105 Cal. App.4th 693, 129 Cal. Rptr.2d 650 (2002).  Stanford argues that in Regents of Univ. of California v. Principal Fin. Group, at least one court in this district implicitly recognized the viability of a private action under § 1371.8 of the Act.  412 F. Supp.2d 1037 (N.D. Cal. 2006).  In that case, however, the defendant did not challenge plaintiff's ability to sue under the Act.  So, the issue was never addressed.  "It is elementary that the language used in any opinion is to be understood in the light of the facts and the issue then before the court.  Further, cases are not authority for propositions not considered."  McDowell and Craig v. City of Santa Fe Springs, 54 Cal. 2d 33, 38, 4 Cal. Rptr. 176, 351 P.2d 344 (1960).

Section 1371.8 does not contain "clear, understandable, unmistakable terms, which strongly and directly indicate that the Legislature intended to create a private cause of action." Lu, 50 Cal.4th at 597.  Stanford has not cited anything from the legislative history of § 1371.8 suggesting that the Legislature intended to create a private right of action.  And, having reviewed the legislative history, this court finds none.  (Majam-Simpson Decl. ¶ 13, Ex. M).  Instead, Stanford argues that § 1371.8 was intended to protect health care providers, and no one but providers would have any incentive to pursue an action under that section.  While the legislative history indicates that § 1371.8 was enacted to protect providers and consumers, that is not the same as indicating that the Legislature clearly intended to create a private right of action for either providers or consumers.

Finally, Stanford argues that California courts will imply a private right of action in accordance with Restatement (Second) of Torts § 874A.  In essence, the Restatement "'allows the court itself to create a new private right to sue, even if the Legislature never considered creation of such a right, and if the court is of the opinion that a private right to sue is appropriate and needed.'"  California Pacific, 2013 WL 2436602 at *3 (quoting Lu, 50 Cal.4th at 602).  "As the California Supreme Court has made clear, however, the use of the Restatement test is limited to

16

1 determining whether to 'recognize a tort action for damages to remedy a *constitutional* violation.'"
2 Id. (quoting Lu, 50 Cal.4th at 602).
3     Plaintiff has thus failed to persuade that it has a private right of action to enforce § 1371.8.
4 Defendant's summary judgment motion therefore is granted as to this claim.

## ORDER

Based on the foregoing, defendant's motion for summary judgment is granted.  The clerk shall enter judgment and close the file.

SO ORDERED.

Dated:   September 23, 2015



_____
HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

**ADDENDUM RE DEFENDANT'S EVIDENTIARY OBJECTIONS**

<u>Declaration of Michael Honeyman</u>

¶ 2, last sentence:    Sustained.  Fed. R. Evid. 401, 403, 602, 701.

¶ 5, third sentence:   Overruled.  Fed. R. Evid. 803(6).

¶ 9:                   Sustained.  Fed. R. Evid. 401, 403, 602, 701.

5:13-cv-04924-HRL Notice has been electronically mailed to:

Barry Sullivan     bsullivan@sacfirm.com, agrigorian@sacfirmonline.com, hcole@sacfirm.com

Christopher Joseph Hapak     chapak@sacfirm.com, ademers@sacfirm.com

Curtis Stanfield Leavitt     cleavitt@kldlawgroup.com, emajam-simpson@kldlawgroup.com, kmoore@kldlawgroup.com, tszabo@kldlawgroup.com

David Patrick McDonough     dmcdonough@kldlawgroup.com, imiller@kldlawgroup.com, kmoore@kldlawgroup.com, tszabo@kldlawgroup.com

Eunice Canamales Majam-Simpson     emajam-simpson@kldlawgroup.com, kmoore@kldlawgroup.com

Melanie Joy Young     jstephenson@sacfirmonline.com

Richard Alan Lovich     rlovich@sacfirmonline.com, ral@lovichlaw.com

Troy R Szabo     tszabo@kldlawgroup.com, kmoore@kldlawgroup.com